IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuel de Jesus Ortega Melendres, on behalf of himself and all others similarly situated; et al.<br><br>Plaintiffs,<br><br>and<br><br>United States of America,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>Joseph M. Arpaio, in his official capacity as Sheriff of Maricopa County, Arizona; et al.<br><br>Defendants. | No. CV-07-2513-PHX-GMS<br><br>**SUPPLEMENTAL ORDER IN RESPONSE TO MR. MONTGOMERY'S PETITION FOR WRIT OF MANDAMUS FILED IN NINTH CIRCUIT CASE NO. 16-73233** |

The Ninth Circuit invites this Court to answer Dennis Montgomery's Petition for a Writ of Mandamus through this supplemental order (Doc. 1857).

Mr. Montgomery asks that the Ninth Circuit direct this Court to do two things. First, grant the *pro hac vice* applications previously filed by Freedom Watch Inc. and its two attorneys, Jonathon Moseley Esq. (May 2015) and Larry Klayman, Esq. (July 2015). Second, grant Mr. Montgomery's motion to intervene, which was stricken when the attorneys's *pro hac vice* petitions were denied.

Petitioner's attorneys filed their *pro hac vice* applications in civil contempt

proceedings against Defendant Joseph M. Arpaio and several named non-party contemnors—none of whom included Mr. Montgomery. Those hearings are long ago complete and resulted in civil contempt determinations entered against Sheriff Arpaio, his Chief Deputy Gerard Sheridan, his former Executive Chief Brian Sands, and Lieutenant Joseph Sousa. (Doc. 1677.) They also resulted in supplemental injunctive relief entered against Sheriff Arpaio. While the underlying case continues to the extent that a Court Monitor has been appointed to oversee Sheriff Arpaio's compliance with the multiple supplemental injunctive relief orders entered in this case, none of the relief pertains to Dennis Montgomery, and no orders were entered against him.

As a result of the civil contempt proceeding, this Court did refer Sheriff Arpaio and three others to the United States authorities with a recommendation that criminal contempt charges be filed, but Mr. Montgomery was not one of these persons. (Doc. 1792.) At the same time that it referred the criminal contempt matter, this Court also transferred any resulting criminal contempt proceedings to another judge. (*Id.*) The criminal contempt charges now constitute a separate proceeding over which Judge Susan R. Bolton of this Court presides. *See United States of America v. Arpaio,* 2:16-CR-01012-1-SRB, Doc. 36 (D. Ariz. Oct. 25, 2016). The United States has since decided to limit the criminal contempt charges that it will pursue to charges against Sheriff Arpaio for his failure to implement this Court's preliminary injunction of December 23, 2011. *Id.* This Court has no basis to believe that Mr. Montgomery has any relation to that charge. To the extent, however, that Mr. Montgomery believes that he needs to intervene in such matters to protect his interests, such a request should be filed in the criminal

- 2 -

contempt proceeding and not in this matter.

In his Petition, Mr. Montgomery incorrectly asserts that the sole reason for this Court's denial of his attorneys' separate applications for *pro hac vice* admission was a conflict caused by their representation of Sheriff Arpaio in another matter. To be sure, that conflict was a significant factor behind the denial, but it was far from the only factor. To the extent that it would be helpful for the Ninth Circuit to be aware of the facts behind the denial of the applications for *pro hac vice*, they are as follows:

On April 23, 2015, Sheriff Arpaio testified in this matter. In relevant part, he testified that Dennis Montgomery was a confidential informant to the Maricopa County Sheriff's Office ("MCSO"). (Doc. 1027 at 645–46.) He testified that Mr. Montgomery advised the MCSO, among other things, that the Department of Justice or other entity had wiretapped the telephones and communications of this and/or other courts, and invaded the privileged domain of the Sheriff's own communications and the computer servers of his counsel. (*Id.* at 649–50, 652–53.) Sheriff Arpaio testified, however, that over time he came to view Mr. Montgomery's allegations as unreliable, and the MCSO now regarded the information they had received from Montgomery as "junk." (*Id.* at 649–50, 652, 655.)

The next day, April 24, in his own testimony, Chief Deputy Sheridan testified that Montgomery told the MCSO that he had a database of material "harvested" by the CIA or other government agencies and that Mr. Montgomery claimed to be able to reconstruct communications and government actions, some of which Montgomery alleged to be inappropriate and/or illegal, from this database. (Doc. 1030 at 1000–1006.) Chief

- 3 -

Deputy Sheridan confirmed Sheriff Arpaio's testimony that Mr. Montgomery had been discredited as an informant, as had the information that he provided. (*Id.* at 1001.)

Shortly thereafter, on April 28, Larry Klayman of Freedom Watch Inc., a public interest law firm that represented Mr. Montgomery (and Sheriff Arpaio on other matters), contacted Sheriff Arpaio's counsel and communicated his desire to coordinate action with Sheriff Arpaio in this matter for the mutual benefit of Sheriff Arpaio and Dennis Montgomery. (Doc. 1198 at Ex. 2.) Mr. Klayman noted his representation of both the Sheriff (on other matters) and Mr. Montgomery, but did not mention any potential conflict of interest. (*Id.*) On April 29, 2015 Sheriff Arpaio wrote an email to Mr. Klayman explicitly informing him that Mr. Klayman's representation of Mr. Montgomery and Mike Zullo created a conflict that precluded coordinating representation in this matter. (*Id.*) In the same email, Sheriff Arpaio also informed Mr. Klayman that he did not represent the Sheriff in this matter. (*Id.*) In response, on April 29, Mr. Klayman indicated that Sheriff Arpaio's counsel was refusing to return Klayman's phone calls and was acting in a way that "is frankly not professional and not in yours or anyone's best interests. We should work together for the common good." (*Id.*)

Thereafter, on May 2, 2015, Mr. Moseley, who identified himself as a staff attorney for Freedom Watch, Inc., filed an application to be admitted *pro hac vice* to which he attached both a letter and "additional information" regarding previous bar discipline he had received in Virginia. (Doc. 1060.)

Mr. Moseley indicated in this "additional information" that he had provided these materials to the other counsel in this action and also asked "that the Court and the parties

- 4 -

consider that I, Jonathon Moseley, am not proposing to actually participate in the conduct of this case, but merely to sponsor the filing of an *Amicus Curiae* brief for Sheriff Joe Arpaio by attorney Larry Klayman of Freedom Watch." (Doc. 1060 at 2; Doc. 1086 at 49–50.)

Yet in the letter submitted with these materials, Mr. Moseley was critical of the testimony of Sheriff Arpaio, or Chief Deputy Sheridan, or both to the extent that their testimony was critical of Mr. Montgomery. (Doc. 1060 at 8–9.) Noting that the reported hearing testimony was unfavorable to Mr. Montgomery, Mr. Moseley states:

[i]n particular, the impression left by a witness who does not have any first-hand knowledge or personal knowledge of Dennis Montgomery's work because he only spoke with Dennis Montgomery and was never actually involved with Montgomery's work combined with loose reporting and false reporting in the news media, falsely suggests action that Dennis Montgomery never had anything to do with. (*Id.* at 9.). Thereafter, Freedom Watch filed motions to intervene and motions to recuse or disqualify this Court.

In a status conference with the parties on May 8, the parties all avowed that despite Mr. Moseley's statement in the "other information" to the contrary, he had not provided them with any of this information or his application. (Doc. 1086 at 50.) Accordingly, the Court then entered an order by which it: (1) copied the parties on Mr. Moseley's information; (2) set forth its concerns that in his *pro hac vice* application Mr. Moseley seemed to desire to enter the case to attack the testimony of a client that he represented in other litigation, (3) noted that the Court would take up Mr. Moseley's *pro hac vice* application on May 14, 2015 at 9:30 A.M. and (4) advised Mr. Moseley of the

- 5 -

hearing by directing the clerk's office to provide him with a copy of the order. (Doc. 1060 at 1–2; *see also* Doc. 1086 at 49–51.)

On May 13, Mr. Moseley filed a supplemental notice in which he clarified that he was not seeking to file a *pro hac vice* application to represent Sheriff Arpaio in this action, but had copied the text from other actions in which Freedom Watch represented the Sheriff. (Doc. 1080.) Mr. Moseley also made the bald, but unexplained statement that neither he nor his client were adverse to Sheriff Arpaio in any respect. (Doc. 1080 at 2.) Mr. Moseley further made arrangements to appear telephonically at the Court's May 14 hearing on the matter. (Doc. 1097 at 32.) Despite these pre-arrangements, Mr. Moseley did not appear. (*Id.*)

At the hearing, Counsel for Sheriff Arpaio and Chief Deputy Sheridan reaffirmed their position that the material provided to the Sheriff by Mr. Montgomery was "discredited" and "junk." (*Id.* at 33.) The Court then set forth on the record how, given that position, and their representation of Sheriff Arpaio in other matters, it would create a breach of Mr. Moseley and Freedom Watch's ethical obligations of loyalty to attack Sheriff Arpaio's testimony by representing Mr. Montgomery in this action. (*Id.* at 33.) Sheriff Arpaio's counsel noted that it was unfortunate that Mr. Moseley did not appear to explain how he believed that this did not present a conflict. (*Id.*)

Plaintiffs also asked to be heard and further set forth significant argument that Mr. Moseley misstated the facts in the materials accompanying his request to be admitted *pro hac vice*, and that Mr. Moseley had actually under-reported his Virginia disciplinary action. (Doc. 1097 at 34–37.) Plaintiffs, citing to the published disciplinary opinion filed

- 6 -

by the Virginia Supreme Court, *Moseley v. Virginia State Bar,* 694 S.E.2d 586 (Va. 2010), noted that in its discipline the Virginia Supreme Court not only included reprimands for misrepresentation to the Court but also noted Mr. Moseley's unprofessionalism, unfair harassment of opposing parties, disruption and disrespect for judicial officers. (*Id.* at 34–39.)

In Arizona, as in many other districts, admission to practice *pro hac vice* is subject to the discretion of the Court. L.R.Civ. 83(b)(2). In light of the apparent conflict of interest created by permitting Mr. Moseley to represent Mr. Montgomery and the new information reflecting Mr. Moseley's record of abusive practices in Virginia, the Court denied Mr. Moseley's request for admission *pro hac vice*. (Doc. 1097 at 39.)

On May 19, Moseley filed a Motion for Reconsideration, in which he made arguments that are similar to those made in the present petition before the Ninth Circuit. (Doc. 1112). Mr. Moseley, with Mr. Klayman appearing on the caption on behalf of Freedom Watch, filed a number of supplements to that request for reconsideration. These supplements were vitriolic, especially as it pertains to this Court.[1] Accordingly Sheriff Arpaio and Chief Deputy Sheridan filed a special pleading to distance themselves from those supplements. (Doc. 1145.) "Sheriff Arpaio and Chief Deputy Sheridan reject the vitriol and inflammatory attacks set forth in the putative intervenor's supplement. Sheriff Arpaio and Chief Deputy Sheridan respect the Court and believe such ad hominem

---

[1] Mr. Moseley, with Mr. Klayman, accused the Court of engaging in a "witch hunt," conspiring against Sheriff Arpaio, his office, as well as Mr. Montgomery to "cover up its extreme bias and prejudice against and to admittedly destroy Sheriff Arpaio's reelection chances in 2016." (Doc. 1140 at 2; *see also* Doc. 1161.)

- 7 -

attacks have no place in this litigation." (*Id.* at 2.)

In denying Moseley's motion for reconsideration, on July 10, the Court again set forth the multiple reasons why it denied Mr. Moseley's application, including the conflict and the ethical rules that would prevent it, his misstatements to the Court, his failure to appear at the May 14 hearing, his past record of misconduct, the conclusion that his "engagement in this action to date demonstrates a substantial likelihood that his conduct would hinder the efficacious administration of justice if he were to be admitted," and a finding that the constitutional concerns he raised were not appropriate in the context of a civil proceeding. (Doc. 1167 at 2–6). On July 15, Mr. Moseley filed his notice of appeal which the Ninth Circuit has recently denied. (Doc. 1173; Doc. 1850.)

**The Denial of Mr. Klayman's Application**

Despite the denial of both Mr. Moseley's application and his motion for reconsideration, and despite the fact that Mr. Klayman, too, is a lawyer working for Freedom Watch Inc. and was then currently and personally representing Sheriff Arpaio, Mr. Klayman on July 20 submitted another *pro hac vice* application to the Court in his own name and then appeared at the Court's regularly scheduled status conference in this matter. (Doc. 1186 at 8.) During that conference he asked to be heard on his *pro hac vice* application. (*Id.* at 46.) The Court noted to Mr. Klayman its concerns that he had the same conflicts as Mr. Moseley did, and the further concern that he might be a witness in the action. (*Id.* at 47.) The Court stated that it would provide the other parties the right to comment on his application and hear the matter at its next scheduled status conference. (*Id.* at 49.) When Mr. Klayman said he would like to fully brief all matters relating to his

- 8 -

application, the Court agreed to set out the matter a little further to allow full briefing on Mr. Klayman's *pro hac vice* application. (*Id.* at 52.)

Nevertheless, at that same hearing, the Court was considering the United States' request to examine the limited material provided by Sheriff Arpaio that was identified as having come from Mr. Montgomery so that it could determine whether anything in the material actually came from or belonged to the government. (*Id.* at 42.) Accordingly, the Court allowed Mr. Klayman to address the issue of whether the Court should allow the Central Intelligence Agency to examine the documents that the Sheriff had received from Mr. Montgomery. (*Id.* at 48.) The Court noted to Mr. Klayman that according to all of the testimony at the hearing Mr. Montgomery had represented to the Maricopa County Sheriff's office that he had taken the documents from the CIA. (*Id.* 49–50.) Under such circumstances, the court observed, that it would not appear that Mr. Montgomery would have a property interest in such documents. (*Id.* at 50.) To the extent that Mr. Montgomery nevertheless asserted that he did have a property interest in the material he provided the Sheriff, the Court invited Mr. Klayman to identify how his interests would be infringed by allowing the CIA to review it to determine whether it contained documents belonging to the CIA, especially when the Court limited the CIA's review of the documents by requiring that "the material will be disseminated to no third party under any condition without the prior approval of this Court." (*Id.* at 52–53.) Mr. Klayman responded that he was "not taking a position on that; I'm simply wanting an opportunity to brief it in the ordinary course." (*Id.* at 51.)

/ / /

- 9 -

During that same July 20 hearing Mr. Klayman did assert that a 2006 ruling from then Magistrate Judge Pro in the United States District Court for Nevada, determined that Mr. Montgomery had rights to certain items which Mr. Klayman represented were the same documents that Mr. Montgomery had given to Sheriff Arpaio. (Doc. 1186 at 50.) In response, this Court asked Mr. Klayman how the District of Nevada ruling, which was in 2006-07, could have involved a database that, according to Mr. Montgomery's communications to the Sheriff, contained telephone calls and/or electronic data that the CIA had supposedly harvested in 2009 and 2010. (*Id.* 50–51.) Again, Mr. Klayman could not respond to that inquiry but requested an opportunity to lay it out for the Court in a systematic way in briefing. (*Id.* at 51.) The Court again agreed to provide him such an opportunity, but in the interim did allow the CIA to review the documents provided by Sheriff Arpaio subject to the terms of the protective order entered by the Court.[2] (*Id.* at 52–53.)

/ / /

---

[2] A few days thereafter this Court determined that Sheriff Arpaio had only provided a small number of the documents given to the MCSO by Mr. Montgomery. The Sheriff was actually withholding 50 hard drives that were provided to the MCSO by Mr. Montgomery in February of 2014. Mr. Montgomery had represented to the MCSO that these 50 hard drives purportedly constituted the database of the documents Mr. Montgomery had taken from the CIA and was supposedly using for his queries for the Sheriff's office. The Court subsequently determined that Sheriff Arpaio had previously flown these hard drives to Washington for examination by former NSA officers and was told they did not contain materials as purportedly represented by Mr. Montgomery. The Sheriff nevertheless continued to conceal them despite direct court orders to the contrary. Accordingly the Court ordered that they be taken into the custody of the federal Marshal for Arizona for safekeeping. It is this Court's understanding that the United States has subsequently at least sampled the contents of the hard drives subject to the terms of the protective order set forth above, and has expressed no further interest in them. The hard drives remain in the custody of the United States Marshal for Arizona. Mr. Montgomery does not contest that he gave the fifty hard drives to the MCSO, although in his petition he alleges that he transferred the copied database subject to conditions.

- 10 -

Not surprisingly, the Plaintiffs opposed Mr. Klayman's application to appear *pro hac vice*. In addition to noting that he had the same conflict problems that Mr. Moseley did, (Doc. 1198), Plaintiffs also set forth detailed opinions by other District Courts explaining in some detail how "Mr. Klayman abused his *pro hac vice* admissions in those cases." (*Id.* at 3–4); *see, e.g., Baldwin Hardware Corporation v. Fanksu Enterprise Corp.,* 78 F.3d 550 (Fed. Cir. 1996), *MacDraw, Inc. v. Cit Group Equipment Financing, Inc.,* 138 F.3d 33 (2d Cir. 1998). Plaintiffs further attached documents that indicated that Mr. Klayman might be a possible witness in the action. (Doc. 1198 at Ex. 1.) Lastly, Plaintiffs' noted "[w]here 'an out–of-state attorney strongly suggests through his behavior that he will neither abide by the court's rules and practices—thus impeding the 'orderly administration of Justice'—nor be readily answerable to the court,' denial of *pro hac vice* status is appropriate." (Doc. 1198 at 4) (quoting *United States v. Ries*, 100 F.3d 1469, 1471 (9th Cir. 1996)).

Defendant Maricopa County opposed Klayman's application, noting that even assuming Montgomery had some right in the material he had given to the MCSO, "that property is not the subject of these contempt proceedings or the underlying civil rights litigation and the disposition of these proceedings will not as a practical matter impair or impede his ability to protect that alleged interest." (Doc. 1202 at 3.) The Arpaio Defendants took no position on Mr. Klayman's application noting that his participation was at the discretion of the Court. (Doc. 1204.)

In his briefing, however, Mr. Klayman failed to substantively respond to any of the Court's questions posed on July 20, nor did he address the disciplinary matters

- 11 -

against him raised by Plaintiffs or the other disciplinary matters that are set forth in *In Re Cliven D Bundy v. United States District Court*, No. 16-72275, 2016 WL 6497179 (9th Cir. October 28, 2016). (Doc. 1223.) He merely made the same blanket assertions that his client had no conflicts with Sheriff Arpaio, and that the District of Nevada rulings established his ownership rights. (*Id.*)

On August 11, the Court ruled on Mr. Klayman's application at a hearing. (Doc. 1237 at 11.) Mr. Klayman, like Mr. Moseley, did not appear telephonically or otherwise, despite the opportunity to do so. (*Id.*) At that hearing, the Court set forth its multiple reasons for denying Mr. Klayman's *pro hac vice* application. (*Id.* at 11–15.) Those reasons were not limited to the conflict between Mr. Montgomery and his other client, Sheriff Arpaio. (*Id.*) They also included Mr. Klayman's abuse of other counsel and the Court in this case, his past abuse of the *pro hac vice* process, his complete failure to indicate how he had an interest that required intervention, and his failure to explain how the 2006-7 Nevada Court rulings established that his client had an ownership interest in these materials. (*Id.*)

In the almost year and a half interim between this Court's denial of Freedom Watch's *pro hac vice* applications and Mr. Montgomery's Petition for Mandamus, Freedom Watch apparently continues to engage in volatile commentary regarding this Court. *See, e.g.,* Ex. 1. Further, on a similar petition for writ of mandamus filed by Mr. Klayman, the Ninth Circuit recently declined to find that the Nevada District Court abused its discretion in denying his *pro hac vice* application. *See In Re Cliven D Bundy v. United States District Court*, No. 16-72275, 2016 WL 6497179 (9th Cir. October 28,

- 12 -

2016). That case further reveals Mr. Klayman is or has been involved in an ethics proceeding before the District of Columbia Bar, was less than candid in his proceedings before Judge Navarro, has been reprimanded, denied *pro hac vice* status, or otherwise sanctioned for violating various local court rules, and has a record of going after judges personally. *Id.* at \*7–\*10. Further, in that case, as opposed to this one, the client Mr. Klayman desired to represent was a defendant in a criminal proceeding. *Id.* \*2. Thus his client's right to chosen counsel was much more weighty than it is in this completed civil proceeding in which Mr. Montgomery is neither a party nor a subject. Nevertheless, the Ninth Circuit declined to find that Judge Navarro even abused her discretion, let alone committed clear error in denying him *pro hac vice* status. *Id.* at \*13.

This Court suggests that its determination is entitled to the same deference. The hearings in this matter are complete; the orders have been entered, and none of them involve Mr. Montgomery. Mr. Montgomery's assertion that the only reason this Court denied the *pro hac vice* applications from Freedom Watch attorneys was their conflict with Sheriff Arpaio is not correct. However, this Court respectfully submits that even if that were the case, in these circumstances the conflict of interest rationale alone would have been sufficient. In addition to the conflict of interest analysis, this Court also based its ruling on Mr. Klayman and Mr. Moseley's behavior in this case and their record for acting similarly in other matters. Nevertheless if the panel believes that the resolution of other matters in which Mr. Klayman represented Mr. Arpaio now represents a change in circumstances that should result in the reconsideration, this Court would suggest that it is appropriate for it to do the initial reconsidering.

- 13 -

This Court has never attempted to prevent Mr. Montgomery from seeking to intervene in this action were he able to raise a legitimate reason for doing so. It has only indicated that it would not allow him to do so through Mr. Klayman, Mr. Moseley or Freedom Watch. (*See, e.g.,* Doc. 1097 at 34) ("I'm certainly not going to prevent Mr. Montgomery from seeking to intervene if he wishes to do so. But he has to do so through counsel that is not going to create a conflict by his very appearance, and it surely seems to me like Mr. Moseley does that."); (Doc. 1186 at 48) ("Your client can hire any other attorney that doesn't present the conflict that you and Mr. Moseley do.")

Further, respectfully, this Court has never ruled on Mr. Montgomery's motions to intervene because those motions were stricken after the *pro hac vice* application of Mr. Moseley was denied. Respectfully, there does not, at this point, seem to be any reason to issue a mandamus order requiring this Court to grant a motion on which it has never ruled. To the extent that Mr. Montgomery wishes to raise such a motion, he is free to do so either pro se or through appropriate counsel.

The Clerk of this Court is ordered to file a copy of this supplemental order with the Ninth Circuit in accordance with that Court's instructions.

Dated this 8th day of November, 2016.

_G. Murray Snow_
Honorable G. Murray Snow
United States District Judge

- 14 -

# EXHIBIT 1

INVASION USA
# 'IL DUCE' JUDGE OUT TO DESTROY SHERIFF JOE
Exclusive: Larry Klayman battles 'Snow' job by Arizona judge in ACLU case

Published: 3 days ago



**LARRY KLAYMAN (HTTP://MOBILE.WND.COM/AUTHOR/LKLAYMAN/)**
About | Email (mailto:lklayman@wnd.com) | Archive (http://mobile.wnd.com/author/lklayman/?archive=true)

Follow   920 followers
Read (http://mobile.wnd.com/author/lklayman/feed/)

On Tuesday I traveled to Phoenix, Arizona, and the federal court there to observe a modern-day lynching by a federal judge, G. Murray Snow, who thinks and acts like the fascist Italian dictator Benito Mussolini – a dictator so warped that he threw his lot in with Adolf Hitler and sent his nation, Italy, into a giant abyss of suffering and death during World War II without even the military means to defeat the Allies. Il Duce, as he was called, ended his career dangling upside down on a rope thanks to Italian partisans who finally took matters into their own hands and meted out justice. I firmly do not advocate this for Judge Snow, as I do not believe in violence but instead a legal system that functions, even through it has been highly corrupted in the last several decades. So it is, as I explain below, that Judge Snow will soon have to answer to the U.S. Court of Appeals for the 9th Circuit, which has recently decided to review the jurists' outrageous misconduct concerning my client Dennis Montgomery.

Snow is the federal judge who unfortunately has been overseeing and administering to a case brought by the American Civil Liberties Union (ACLU), an ultra-leftist so-called public-interest group, against America's sheriff, Joe Arpaio, of Maricopa County, Arizona, over his alleged profiling of illegal aliens. Representing the ACLU, in part, is the law firm of Covington and Burling. Partners in the law firm are none other than former Obama Attorney General Eric Holder and former head of the Obama Justice Department's Criminal Division, Lanny Breuer – both haters of Sheriff Joe who, on Obama's apparent orders, want to destroy him. To add insult to injury, one of Holder's and Breuer's partners at Covington and Burling is the brother-in-law of Judge Snow. During the course of the case, Snow has ordered that millions of dollars in attorneys' fees be paid by the county to his brother-in-law's law firm – clearly an unethical directive.

Moreover, during the course of this case, Judge Snow's wife was heard by credible and corroborated witnesses saying that her husband would use the ACLU case before him to destroy Sheriff Joe. Judge Snow has never refuted that his wife disclosed this to her friends at a restaurant, where she was overheard making this "confession."

Consistent with this, Judge Snow has indeed proceeded to try to destroy America's sheriff, saying that he would not only hold Arpaio in civil contempt for violating his order to stop the alleged profiling, but also refer him and others in the Maricopa County Sheriff's Office (MSCO) to the Obama Justice Department for criminal prosecution over allegations they have perjured themselves during court testimony. During this trial, Judge Snow, at the urging of the ACLU and Covington and Burling lawyers, expanded the case improperly to also involve my other client, Dennis Montgomery, a CIA/NSA whistleblower who, having received immunity to come forward, has been cooperating with FBI Director James Comey and his general counsel, providing evidence that these intelligence agencies have been illegally "harvesting" the financial and other records of Supreme Court justices, hundreds of other judges, prominent businessmen and anyone else, presumably so they could coerce and commit blackmail on behalf of Obama and his minions. And, the crimes go beyond the Obama administration into other administrations as well.

The ACLU has alleged, again through Covington and Burling and its own rabid Arpaio-hating lawyers, that Montgomery was engaged by the MSCO to investigate Judge Snow. While this never happened, Snow used this as a principle pretext to drag my client into his "kangaroo court." In defense of this, Sheriff Joe's lawyers in this case (I represent the sheriff before the Supreme Court over Obama's illegal executive actions on amnesty), who have themselves been threatened by Judge Snow, falsely claimed that Montgomery's work with the MSCO was ineffective in any event since he was a fraud. These lawyers thus rolled over to Judge Snow, sucking up to him by coming up with a phony defense, rather than zealously representing Sheriff Joe. Instead they unethically sought to ad supply their own derrieres. Dennis Montgomery was thus made the scapegoat or lightening rod to draw attention away from Judge Snow's false allegations that the sheriff was illegally investigating him. As a result, Snow has made a false finding that Montgomery is a fraud without even allowing my client to appear and deny the allegations.

To protect my client Montgomery but do no harm to my other client Sheriff Joe, my associate and I sought to intervene in the case, as well as to move for disqualification of Judge Snow. Predictably, he denied our motions and we took an appeal to the 9th Circuit. While this appeal is being considered and heard – oral argument is set for this September – Judge Snow, despite the likelihood he will soon be disqualified on order of the 9th Circuit, has moved ahead with his

inquisition of Sheriff Joe and by association Montgomery. And, that was the reason I traveled to Phoenix Tuesday to observe Judge Snow's latest perversion of justice at a hearing he had called for 9 a.m. to discuss how to punish Arpaio and persons associated with the sheriff, including Montgomery.



Outside Judge Snow's courtroom.

As I stood outside the courtroom waiting for the U.S. Marshals to allow persons into the courtroom, I observed an array of Sheriff Joe haters who gleefully came to see his lynching, everyone from Muslims in full dress to La Raza radical Hispanic

types who support illegal immigration. Outside the courthouse shouting on bullhorns were seemingly violent protesters, hanging America's sheriff in effigy. The scenes both inside and outside were surreal.



Protesters outside courthouse.



## Military Husband Jaw Dropped After Seeing Her Transformation!

ad supply

Husband didn't recognize his wife when he arrived home from Afghanistan...

>> READ THE STORY

TIME

As I took my seat and awaited Judge Snow's entry, I reflected on how politicized and corrupt the court system has become, with few exceptions. And, even with this mindset, I was surprised when Judge Snow appeared and rather than a taking a seat behind the bench instead stood up at a podium he had built to rest on the bench, towering over the courtroom with his huge presence like the smaller dictator Il Duce had from a balcony at Piazza del Popolo in the center of Rome.

There Mussolini had confidently asked the good Italian people, who largely did not side with Hitler or his persecution of Jews and others, to simply give him a handful of dead, and Italy, along with Germany, would rule the world.

Judge Snow, like Mussolini, will soon have his day of reckoning, legally before the 9th Circuit. Let us pray that justice will be done, and I am successful and the appellate court will order Judge Snow disqualified. In this way his persecution of America's sheriff and Dennis Montgomery will also end since the 9th Circuit could then vacate, that is void, all of his unethical findings, threats and other illegal actions.

*Media wishing to interview Larry Klayman, please contact media@wnd.com (mailto:media@wnd.com).*

### Receive Larry Klayman's commentaries in your email

BONUS: By signing up for Larry Klayman's alerts, you will also be signed up for news and special offers from WND via email.

**Name ***

First | Last

**Email ***

Where we will email your daily updates

**Postal code ***

A valid zip code or postal code is required

ad supply

Click the button below to sign up for Larry Klayman's commentaries by email, and keep up to date with special offers from WND. You may change your email preferences at any time.

Sign me up!